IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA    )
                            )
         v.                 )
                            )    1:18-cr-00381 (LMB)
ARISTIDES RIVERA LOPEZ,     )
    a/k/a Aristides Lopez-Rivera,    )
                            )
         Defendant.         )

MEMORANDUM OPINION

Before the Court is defendant's motion to dismiss the indictment [Dkt No. 22]. For the

reasons stated in open court and further developed in this Memorandum Opinion, defendant's

motion has been denied.[1]

I.

Aristides Rivera Lopez, also known as Aristides Lopez Rivera ("defendant"),[2] is a citizen

of El Salvador who in April 2004 entered the United States near Laredo, Texas without

authorization or inspection. He was detained by U.S. Immigration and Customs Enforcement

("ICE") officers and on April 20, 2004 was personally served with a Notice to Appear (the

"Notice") initiating removal proceedings under the Immigration and Nationality Act ("INA").

The Notice alleged that defendant was subject to removal and ordered him to appear before an

---

[1] After the Court orally denied defendant's motion on November 27, 2018 [Dkt. No. 26],
defendant waived his right to trial by jury and proceeded to a stipulated bench trial. The Court
found defendant guilty of illegal reentry after deportation, sentenced him to time served without
any period of supervised release, and ordered him to pay the $100 mandatory special assessment
[Dkt. No. 28].

[2] Defendant has advised the Court that the correct order of his last names is "Lopez Rivera";
however, official records from defendant's initial encounter with immigration authorities list his
name as "Aristides Rivera-Lopez" [Dkt. No. 22-1], and as a result the criminal complaint [Dkt.
No. 1] and indictment [Dkt. No. 16] in this case included both names. For consistency, the Court
has maintained this caption.

immigration judge in Harlingen, Texas; however, in the blanks provided for the date and time of his hearing, the supervising patrol agent simply wrote "on a date to be set" and "at a time to be set." The Notice also provided a series of advisements, including that defendant could obtain counsel to represent him at the hearing; that he could present evidence, elicit testimony, or otherwise challenge the allegations in the Notice; that the immigration judge would advise him of any potential grounds for relief from removal; and that he would have the right to appeal any adverse decision by the immigration judge. It further advised defendant that he was required to maintain an up-to-date address with the immigration court, that notice of his hearing date would be sent to that address, and that failure to appear at the hearing could result in an order of deportation in absentia. Although the Notice was written in English, it contained a certificate of service indicating that defendant was read the notice in Spanish.[3] Defendant signed that certificate. He also requested an immediate hearing and waived the standard 10-day period designed to enable him to retain counsel.[4]

On the same day he received the Notice, defendant was also presented with a prepared Stipulated Request for Order and Waiver of Hearing (the "Stipulation"). The Stipulation was written in both English and Spanish and was read to defendant in Spanish. It stated that although defendant had received a list of free legal service providers who could represent him in the removal

---

[3] The certificate reads: "The alien was provided oral notice in the Spanish language of the time and place of his or her hearing and of the consequences of failure to appear." Although nothing specifically indicates that the full contents of the Notice were in fact read to defendant in Spanish, both parties have assumed as much, see Def. Mot. to Dismiss Indictment [Dkt. No. 22] 2 n.2; Resp. of the United States to Def.'s Mot. to Dismiss Indictment [Dkt. No. 23] 3, and the Court has adopted that assumption for purposes of deciding defendant's motion to dismiss.

[4] See 8 U.S.C. § 1229(b)(1) (2000 & Supp. IV 2004) ("In order that an alien be permitted the opportunity to secure counsel before the first hearing date in [removal] proceedings . . . , the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear, unless the alien requests in writing an earlier hearing date.").

proceeding, he did not "wish to be represented by an attorney" and instead had "elect[ed] to represent [him]self." Defendant signed the Stipulation, thereby acknowledging that he understood his procedural rights under the INA—including his rights to appear before an immigration judge, to examine and object to evidence against him, to present witnesses on his own behalf, and to demand that the government prove his removability—but had chosen to waive those rights so that "removal proceedings [could] be conducted solely by way of written record without a hearing." Further, in the Stipulation defendant admitted "that all the factual allegations contained in the [Notice were] true and correct as written"; that he was "deportable/inadmissible as charged"; and that he did not intend to seek "voluntary departure, asylum, . . . family unity benefits, legalization benefits, cancellation of removal, naturalization, or any other possible relief or other benefits" under the INA. Finally, defendant affirmed that he understood signing the Stipulation would result in his removal from the United States; that he accepted such an order of removal; that he waived any appeal of that order; and that he accepted those consequences "voluntarily, knowingly, and intelligently, and without duress, force, or coercion."

In addition to his civil immigration charge, defendant was charged with the misdemeanor of unlawful entry under 8 U.S.C. § 1325.[5] The criminal complaint alleged that defendant had entered the United States at a place other than as designated by immigration officers, specifying that he had attempted to evade inspection "by wading the Rio Grande River." On April 21, 2004—one day after he signed the Stipulation—he pleaded guilty to that misdemeanor charge

---

[5] "Any alien who . . . enters or attempts to enter the United States at any time or place other than as designated by immigration officers . . . shall, for the first commission of any such offense, be fined under title 18 or imprisoned not more than 6 months, or both." 8 U.S.C. § 1325(a) (2000 & Supp. IV 2004).

and was sentenced to 30 days' imprisonment. The record shows that defendant was represented by a federal public defender in that criminal proceeding.

On May 6, 2004, an immigration judge ordered defendant removed from the United States based on the Stipulation he had signed. He was deported to El Salvador a month and a half later. He returned to the United States at an unknown time and came to the attention of federal immigration authorities in July 2018 after being arrested and charged with misdemeanor assault. Immigration officials took defendant into custody after he was released on bail and have sought reinstatement of his April 2004 deportation order.[6] In addition, defendant was indicted for one count of the felony offense of illegal reentry after deportation under 8 U.S.C. § 1326.[7]

Defendant moved to dismiss the indictment on two independent grounds. First, relying on Pereira v. Sessions, 138 S. Ct. 2105 (2018), he argued that because the Notice he received failed to specify the date and time of his removal hearing, the immigration judge was without jurisdiction to order him deported, and consequently the 2004 deportation order is void ab initio and cannot serve as the basis for this felony prosecution. Second, defendant argued that the lack of a date and time on the Notice rendered his resulting deportation fundamentally unfair and thus subject to collateral attack under 8 U.S.C. § 1326(d). As explained in open court and further developed below, although defendant's 2004 immigration proceeding was not without defects,

---

[6] See 8 U.S.C. § 1231(a)(5) ("If the Attorney General finds that an alien has reentered the United States illegally after having been removed . . . under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.").

[7] Any noncitizen who has been removed from the United States and thereafter enters the country without obtaining the Attorney General's express consent is guilty of a felony punishable by up to two years' imprisonment, with greater sentences available in specific circumstances not relevant here. 8 U.S.C. § 1326(a).

those defects did not deprive the immigration judge of the power to order defendant's removal, and defendant's waiver of his rights in the Stipulation forecloses his § 1326(d) collateral attack.

II.

In United States v. Mendoza-Lopez, 481 U.S. 828 (1987), the Supreme Court applied the principle "that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding," and held that where an immigration judge fails to inform a noncitizen[8] of his rights to counsel and to seek relief from removal, the resulting deportation order cannot form the basis of a subsequent prosecution for illegal reentry after deportation. Id. at 837-42. Crucial to the outcome in Mendoza-Lopez was what the Court described as "fundamental procedural defects" in the deportation hearing that effected "a complete deprivation of judicial review" of the deportation order. See id. at 840-42.

After Mendoza-Lopez, the federal courts were left to grapple with the standard that should be applied in evaluating a collateral attack on an underlying deportation order. See, e.g., United States v. Fares, 978 F.2d 52, 57 (2d Cir. 1992) (debating whether a defendant must demonstrate not only that he was deprived of the right to appeal but also that he was prejudiced as a result); United States v. Encarnacion-Galvez, 964 F.2d 402, 406 (5th Cir. 1992) (distilling a two-step test requiring the defendant to demonstrate that his deportation proceeding was "fundamentally unfair" and that the procedural defect complained of had "effectively eliminated [his] right to obtain judicial review of his deportation"); United States v. Proa-Tovar, 945 F.2d

---

[8] Following the lead of the Supreme Court, the term "noncitizen" is used "to refer to any person who is not a citizen or national of the United States." Pereira v. Sessions, 138 S. Ct. 2105, 2110 n.1 (2018).

1450, 1453-54 (9th Cir. 1991) (rejecting a requirement that the defendant show prejudice), rev'd

en banc, 975 F.2d 592, 594-95 (9th Cir. 1992) (holding that the defendant must show prejudice).

Congress ultimately amended the INA to establish a statutory right of collateral attack.

See Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 441,

110 Stat. 1214, 1279 (codified at 8 U.S.C. § 1326(d)). Section 1326(d) provides:

> In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order . . . unless the alien demonstrates that—
>
> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
>
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
>
> (3) the entry of the order was fundamentally unfair.[9]

8 U.S.C. § 1326(d).

Although it is often asserted that Congress "codifie[d]" Mendoza-Lopez by enacting

§ 1326(d), see, e.g., United States v. Moreno-Tapia, 848 F.3d 162, 169 (4th Cir. 2017); see also

United States v. Sosa, 387 F.3d 131, 136 (2d Cir. 2004) ("Section 1326(d) was intended as a

response to, and codification of, Mendoza-Lopez . . . ."), that is not entirely accurate. In

proposing what became § 1326(d), the conference committee made clear that its intent was to

constrain as much as to codify—or, as the committee put it, to "limit[] the ability of an [sic]

deportable alien to collaterally challenge an [sic] deportation order in a pending criminal case."

---

[9] Over time, the Fourth Circuit, along with other courts of appeals, has interpreted the fundamental unfairness prong as embodying a requirement that the defendant demonstrate prejudice—that is, that "but for the errors complained of, there was a reasonable probability that he would not have been deported." United States v. El Shami, 434 F.3d 659, 665 (4th Cir. 2005); see also, e.g., United States v. Daley, 702 F.3d 96, 101 (2d Cir. 2012) ("Fundamental fairness arises when a fundamental procedural error is coupled with prejudice resulting from that error." (internal quotation marks and citation omitted)).

H.R. Rep. No. 104-518, at 119 (1996) (Conf. Rep.); accord H.R. Rep. No. 104-22, at 16 (1995) (noting that the provision was intended to establish that aliens could bring collateral attacks "only . . . in limited circumstances"). For this reason, other courts have observed that § 1326(d) only "partially" codifies the rule of Mendoza-Lopez, see, e.g., United States v. Garcia-Martinez, 228 F.3d 956, 959 n.5 (9th Cir. 2000), and whether there may be circumstances in which due process requires that a defendant be given an opportunity to bring a collateral attack beyond the requirements and limitations of § 1326(d) remains an open question.

III.

Defendant asserts that he need not satisfy § 1326(d)'s requirements to prevail on his motion to dismiss the indictment. Instead, because the Notice he received failed to specify a date and time for the removal hearing, he argues that the resulting deportation order was issued by an immigration judge who lacked subject-matter jurisdiction and that this fatal flaw frees him from the burden of making each of the showings under § 1326(d). Although several district courts have adopted this line of reasoning,[10] defendant's arguments are ultimately unconvincing.

A.

Under the INA as it existed in 2004, immigration authorities who suspected a noncitizen was deportable were required to serve the noncitizen with a "notice to appear." 8 U.S.C.

---

[10] See, e.g., United States v. Santiago Tzul, No. 4:18-cr-00521, 2018 WL 6613348, at *2-6 (S.D. Tex. Dec. 4, 2018); United States v. Ortiz, No. 3:18-cr-00071, 2018 WL 6012390, at *2-3 (D.N.D. Nov. 7, 2018); United States v. Virgen-Ponce, 320 F. Supp. 3d 1164, 1165-66 (E.D. Wash. 2018). But see United States v. Zapata-Cortinas, No. SA-18-cr-00343, 2018 WL 6061076, at *7-8 (W.D. Tex. Nov. 20, 2018) (reconsidering a prior order that had followed Virgen-Ponce's reasoning and concluding that a noncitizen whose notice to appear failed to specify when or where the deportation hearing would be held must nevertheless satisfy § 1326(d)).

§ 1229(a)(1) (2000 & Supp. IV 2004). That notice to appear had to include the following information:

> (A) The nature of the proceedings against the alien.
>
> (B) The legal authority under which the proceedings are conducted.
>
> (C) The acts or conduct alleged to be in violation of law.
>
> (D) The charges against the alien and the statutory provisions alleged to have been violated.
>
> (E) The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel . . . and (ii) a current list of counsel prepared [to represent aliens pro bono].
>
> (F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting [removal] proceedings . . . .
>
> (ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.
>
> (iii) The consequences under section 1229a(b)(5) of this title of failure to provide address and telephone information pursuant to this subparagraph.
>
> (G)(i) The time and place at which proceedings will be held.
>
> (ii) The consequences under section 1229a(b)(5) of this title of the failure, except under exceptional circumstances, to appear at such proceedings.

Id. (emphasis added). Any noncitizen who failed to appear at a hearing was subject to being ordered removed in absentia, id. § 1229a(b)(5)(A), and such an order could be rescinded only upon a showing of exceptional circumstances or that the noncitizen did not receive proper notice of the hearing, id. § 1229a(b)(5)(C).

The Attorney General, acting under congressionally delegated authority,[11] promulgated regulations governing how removal proceedings would be initiated. One such regulation stated: "Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court." 8 C.F.R. § 1003.14(a) (2004). "Charging document," in turn, was defined as "the written instrument which initiates a proceeding before an Immigration Judge," and "[f]or proceedings initiated after April 1, 1997," one such charging document was a "Notice to Appear."[12] Id. § 1003.13. Finally, a separate regulation set forth the notice to appear's required contents. Notably, although the regulation mostly tracked the requirements included in 8 U.S.C. § 1229(a)(1), it did not require that the notice to appear specify when and where the removal hearing would be held. See id. § 1003.15. Instead, the regulations required immigration authorities to include the hearing's date, time, and location in the notice to appear only "where practicable" and otherwise permitted them to notify the noncitizen of that information at a later time. See id. § 1003.18(b).

B.

Defendant relies heavily on Pereira v. Sessions, 138 S. Ct. 2105 (2018), which has generated a growing number of motions to dismiss similar to defendant's. Pereira involved a statutory remedy known as cancellation of removal, which is available to some nonpermanent residents who have "been physically present in the United States for a continuous period of not less than 10 years." 8 U.S.C. § 1229b(b)(1). Under the INA's "stop-time rule," the period of

---

[11] See 8 U.S.C. § 1103(g)(2) (2000 & Supp. IV 2004) ("The Attorney General shall establish such regulations . . . and perform such other acts as [he] determines to be necessary for carrying out this section.").

[12] Other post-April 1997 charging documents include the "Notice of Referral to Immigration Judge" and the "Notice of Intention to Rescind and Request for Hearing by Alien," 8 C.F.R. § 1003.13 (2004), neither of which is relevant to this case.

continuous physical presence in the United States is deemed to end "when the alien is served a notice to appear under section 1229(a) of this title." Id. § 1229b(d)(1). At issue in Pereira was what the Supreme Court described as a "narrow question": whether the stop-time rule is triggered by service of a notice to appear that fails to specify when and where the removal hearing will take place. See 138 S. Ct. at 2109-10.

In Pereira, the Court held that any notice to appear "that does not inform a noncitizen when and where to appear for removal proceedings is not a 'notice to appear under section 1229(a)' and therefore does not trigger the stop-time rule." 138 S. Ct. at 2110. The Court principally relied on the plain language of the INA, observing that the stop-time provision expressly refers to "a notice to appear under § 1229(a)" and thus incorporates § 1229(a)'s definitional requirement that a notice to appear must "specify[] . . . [t]he time and place at which the [removal] proceedings will be held." See id. at 2114 (quoting 8 U.S.C. §§ 1229(a)(1), 1229b(d)(1)). The Court confirmed this plain meaning by reference to the broader statutory context[13] as well as "common sense"; as the Court explained,

> If the three words "notice to appear" mean anything in this context, they must mean that, at a minimum, the Government has to provide noncitizens "notice" of the information, i.e., the "time" and "place," that would enable them "to appear" at the removal hearing in the first place. Conveying such time-and-place information to a noncitizen is an essential function of a notice to appear, for without it, the Government cannot reasonably expect the noncitizen to appear for his removal proceedings. To hold otherwise would empower the Government to trigger the stop-time rule merely by sending noncitizens a barebones document labeled "Notice to Appear," with no mention of the time and place of the removal proceedings, even though such documents would do little if anything to facilitate appearance at those proceedings. We are not willing to impute to Congress . . . such

[13] For example, the Court pointed to the INA provision giving a noncitizen "the opportunity to secure counsel before the first hearing date," 8 U.S.C. § 1229(b)(1), observing that such an opportunity would not be meaningful unless the noncitizen and his counsel had notice of the hearing date and thus the ability to prepare appropriately. See Pereira, 138 S. Ct. at 2114-15.

[a] contradictory and absurd purpose, particularly where doing so has no basis in the statutory text.

Id. at 2115-16 (alterations in original) (internal quotation marks, footnote, and citation omitted). Nothing in Pereira addressed the immigration judge's underlying jurisdiction.[14]

## C.

Defendant argues that the indictment should be dismissed without reference to the § 1326(d) factors based on a complex line of reasoning: (i) the governing regulations provide that jurisdiction vests with the immigration court only upon the filing of a "notice to appear"; (ii) those regulations impose a limitation on the immigration court's subject-matter jurisdiction, such that defects strip the court of all power to act and may not be waived or forfeited; (iii) to vest jurisdiction with the immigration court, a notice to appear must comply with the requirements in 8 U.S.C. § 1229(a), particularly in listing when and where the removal hearing will be held; (iv) the Notice defendant received failed to provide a date or time for the hearing, and thus the immigration judge lacked subject-matter jurisdiction to order him deported regardless of the concessions he made in the Stipulation; and (v) given that jurisdictional defect, defendant cannot now be prosecuted for illegal reentry after deportation and need not make particularized showings of exhaustion of remedies, deprivation of judicial review, or fundamental unfairness. Defendant's argument is unavailing.

---

[14] The Government suggests that the Pereira Court's direction that the case be "remanded for further proceedings consistent with this opinion," 138 S. Ct. at 2120, amounts to an implicit holding that the immigration court was properly vested with jurisdiction despite the defect in the notice to appear. The "unrefined disposition[]" in Pereira is at best a "'drive-by jurisdictional ruling[]' that should be accorded 'no precedential effect' on the question" presented by defendant's motion to dismiss in this case. Arbaugh v. Y & H Corp., 546 U.S. 500, 511 (2006) (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 91 (1998)).

1.

The first issue is how to understand the term "Notice to Appear" in 8 C.F.R. § 1003.13:

as a reference to the statutory notice to appear in 8 U.S.C. § 1229(a), which must specify (among

other things) when and where the removal hearing will be held, or to the regulatory notice to

appear in 8 C.F.R. §§ 1003.15(c) and 1003.18(b), for which the hearing's date, time, and location

are required only "where practicable"? Notably, the statutory provision at issue in Pereira

"expressly referenc[ed] § 1229(a)," which the Court deemed significant in concluding that the

stop-time rule incorporated the definitional elements of § 1229(a). See 138 S. Ct. at 2114. There

is no such express reference in 8 C.F.R. § 1003.13 and, as several courts have observed, the

majority opinion in Pereira repeatedly emphasized the narrow scope of its holding and did not

address any of the regulations governing how removal proceedings are initiated. See, e.g.,

Ramat v. Nielsen, 317 F. Supp. 3d 1111, 1116-17 (S.D. Cal. 2018), appeal docketed, No. 18-

56190 (9th Cir. Sept. 5, 2018).

Nonetheless, the Court concludes that where the INA's implementing regulations require

a "notice to appear," that notice must satisfy the statutory requirements laid out in § 1229(a).

Although Congress is free to establish a requirement in one statutory provision and disregard that

requirement in another, the executive branch is not similarly entitled to sweep an explicit

statutory requirement to the side. To the contrary, the regulatory authority delegated to the

Attorney General allows him only "to fill any gap left, implicitly or explicitly, by Congress."

Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 (1984) (citation

omitted). Before the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

("IIRIRA") went into effect in April 1997, removal proceedings were initiated through the filing

of an "order to show cause"; although immigration authorities were permitted to include the time

and place of the hearing in the order to show cause, they were not required to do so. See United States v. Mendez Fernandez, No. 1:18-cr-00307, 2018 WL 5929632, at \*2-3 (E.D. Va. Nov. 13, 2018). In light of this history, it is clear that the regulations' system of providing the time and place of the hearing only "where practicable" was an attempt to restore the pre-IIRIRA flexibility given to immigration authorities. That attempted revision is inconsistent with the INA and with the separation of powers more generally, and it is without effect.

2.

Defendant's argument that the governing regulations impose a subject-matter jurisdictional limit on the immigration court's power is less successful. Although the regulations provide that "[j]urisdiction vests . . . when a charging document is filed with the Immigration Court," 8 C.F.R. § 1003.14(a) (2004), "jurisdiction" is a term that can convey "many, too many, meanings." Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen, 558 U.S. 67, 81 (2009) (citation omitted). For example, it may refer to subject-matter jurisdiction, meaning "a tribunal's power to hear a case," which "can never be forfeited or waived," id. (citation omitted); however, it can also refer to a mandatory component of the adjudicative process that may nonetheless be forfeited or waived, id. at 81-82. Courts have struggled with how to characterize section 1003.14's use of the term. See United States v. Zapata-Cortinas, No. SA-18-cr-00343, 2018 WL 6061076, at \*9 n.10 (W.D. Tex. Nov. 20, 2018) (collecting cases).

Several factors in combination reveal that section 1003.14 does not impose a subject-matter jurisdictional limitation. For one, the text of the regulation is inconsistent with that interpretation.[15] The regulation's emphasis on the initiation of proceedings and on service to the

[15] Perhaps because of the unsettled nature of the doctrine, see, e.g., Kisor v. Wilkie, No. 18-15, 2018 WL 6439837 (U.S. Dec. 10, 2018) (granting certiorari to decide whether to overrule Auer v. Robbins, 519 U.S. 452 (1997), and Bowles v. Seminole Rock & Sand Co., 325 U.S. 410

opposing party[16] suggests it is focused not on the immigration court's fundamental power to act but rather on "requiring that the parties take certain procedural steps at certain specified times," which weighs in favor of finding that the requirement is more like a "claim-processing" rule than a genuine jurisdictional requirement. Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 435-36 (2011). That no charging document is required for the immigration court to commence bond proceedings, 8 C.F.R. § 1003.14(a), is further evidence that the regulation does not limit the court's subject-matter jurisdiction.

Moreover, defendant's reliance on cases involving the subject-matter jurisdiction of the federal courts, see, e.g., Def. Mot. to Dismiss Indictment [Dkt. No. 22] 10 ("[A]ny action by a court without subject-matter jurisdiction is 'ultra vires' and therefore void." (quoting United States v. Hartwell, 448 F.3d 707, 715 (4th Cir. 2006)), is misguided. The metes and bounds of a federal court's subject-matter jurisdiction are governed by the Constitution's vesting of the federal judicial power, see U.S. Const. art. III, § 2, and by congressional grants of jurisdiction, see, e.g., 28 U.S.C. § 1331. By analogy, an agency's subject-matter jurisdiction would stem from congressional grants of authority to act in a particular arena. Yet in this case defendant relies not on a congressional limitation, but rather on a regulation promulgated by the agency itself. In that sense, section 1003.14(a) is more akin to a federal court's local rules, which (like the regulations

_____

(1945)), the Government has not advanced an argument based on deference in light of an ambiguous agency regulation, and the Court will not consider that issue. But cf. United States v. Romero-Caceres, No. 1:18-cr-00354, 2018 WL 6059381, at *8 (E.D. Va. Oct. 19, 2018) (deferring to the Board of Immigration Appeals's interpretation that a notice to appear lacking the time or place of the deportation hearing does not divest the immigration court of jurisdiction).

[16] See 8 C.F.R. § 1003.14(a) ("Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court . . . . The charging document must include a certificate showing service on the opposing party . . . ." (emphasis added)).

at issue here) are the product of congressionally delegated gap-filling authority, see Fed. R. Civ. P. 83(a)(1), but which in no way affect the federal court's subject-matter jurisdiction. Accordingly, the best reading of section 1003.14(a) is that although it imposes a procedural requirement on immigration authorities' initiation of removal proceedings, that requirement is not "jurisdictional" in the formal sense, and a defect in a notice to appear does not necessarily render a resulting deportation order void ab initio.[17]

## IV.

Defendant's second argument, framed as a collateral attack under 8 U.S.C. § 1326(d), also fails. To prevail under 1326(d), defendant bears the burden of making each of three independent showings: that he exhausted available administrative remedies, that he was deprived of the opportunity to seek judicial review, and that the entry of the removal order was fundamentally unfair. He is unable to make any of those showings.

To be sure, a notice to appear's failure to specify the time and place of the removal hearing may give rise to a successful § 1326(d) attack. Cf., e.g., United States v. Mendez Fernandez, No. 1:18-cr-00307, 2018 WL 5929632, at *4-7 (E.D. Va. Nov. 13, 2018) (explaining how the defendant had satisfied the § 1326(d) requirements apart from showing that he had been prejudiced by not receiving notice of the time and place of his hearing). Yet this is not a case in which a flaw in the deportation proceeding unjustly interfered with the noncitizen's ability to exhaust administrative remedies or seek judicial review. Cf., e.g., El

---

[17] This conclusion is bolstered by the potentially immense consequences of a ruling that any order entered by an immigration court in proceedings initiated through a defective notice to appear is without legal effect. As the Government points out, defendant's jurisdictional theory would presumably extend not only to unfavorable outcomes such as deportation orders but also to favorable outcomes such as orders granting discretionary relief from removal. Defendant offers no cogent response to this implication of his argument.

Shami, 434 F.3d at 662-64 (concluding that failure to notify the noncitizen of his deportation hearing had resulted in "a complete deprivation of administrative and judicial review" of the resulting deportation order entered in absentia). Nor is this a case in which the absence of a date and time for the hearing resulted in a deportation order of which the noncitizen was utterly unaware. To the contrary, by signing the Stipulation, defendant made clear that he did not intend to obtain counsel, did not wish to contest the factual charges against him, was not seeking any form of relief from removal, accepted a removal order as a "final disposition," and had no interest in appealing or otherwise challenging that order. Under these circumstances, defendant was not denied meaningful judicial or administrative review. See, e.g., United States v. Lira-Ramirez, No. 18-cr-10102, 2018 WL 5013523, at *4-7 (D. Kan. Oct. 15, 2018) ("[K]nowingly giving up the opportunity for judicial review in a removal proceeding precludes an alien from challenging the validity of the removal order in a § 1326 prosecution."); see also United States v. Mendoza-Sanchez, No. 17-cr-00189, 2018 WL 5816346, at *3 (D.N.H. Nov. 5, 2018) (observing that the defendant had made no attempt to demonstrate that he had been "deprived of the opportunity for judicial review of the removal order" because it was "undisputed" that he had "knowingly and voluntary waived his right to appeal the removal order"). Moreover, by stipulating that he was removable and affirmatively waiving his right to seek discretionary relief from removal, defendant cannot show "a reasonable probability that he would not have been deported," United States v. Lopez-Collazo, 824 F.3d 453, 460 (4th Cir. 2016).

Defendant's only recourse is to argue that he did not knowingly and voluntarily waive his rights by signing the Stipulation. Defendant asserts that without having been informed of the date and time of his hearing, he failed to understand "the nature of his right to a hearing" or

16

"how his right to a hearing would generally apply in his circumstances." Defendant provides no authority to support this novel theory,[18] and the Court finds it unpersuasive. Although uncertainty about when a deportation hearing will be held could affect a noncitizen's incentives to waive a hearing, mere uncertainty does not deprive a noncitizen of the ability to make a "voluntary and intelligent choice among the alternative courses of action open" to him, United States v. Moussaoui, 591 F.3d 263, 278 (4th Cir. 2010). Given the totality of factual circumstances here, any uncertainty about when defendant's removal hearing would be held was neither so severe as to undercut his ability to understand the essential contours of his rights nor so inequitable as to render his choice to waive those rights coerced, involuntary, or unintelligent.[19] Instead, the evidence in this record shows that defendant understood his rights sufficiently well, and as such his choice to waive them is fatal to this collateral attack against the resulting deportation order.

---

[18] The most defendant offers is a citation to Mendoza-Lopez, arguing that the Supreme Court dismissed the indictment there in part because the respondents' "waivers of their rights to appeal were not considered or intelligent." See 481 U.S. at 840-42. That language is inapplicable here for multiple reasons. First, in Mendoza-Lopez neither party had challenged the lower courts' finding that the immigration judge had "fail[ed] . . . to explain adequately [the respondents'] right to suspension of deportation or their right to appeal." Id. at 840. The Court therefore assumed, rather than decided, the point on which defendant now seeks to rely. Moreover, whereas the noncitizens in Mendoza-Lopez were deprived of critical information related to affirmative rights they held under the INA, defendant here had no affirmative right to a hearing to be held within a given time. In that sense, it bears observing that some uncertainty as to when a removal hearing will be held inheres in the nature of civil immigration proceedings. Cf. Argiz v. U.S. Immigration, 704 F.2d 384, 387-88 (7th Cir. 1984) (per curiam) (holding that noncitizens facing deportation proceedings are not protected by the Speedy Trial Clause or statutory schemes giving effect to that constitutional right).

[19] Moreover, any argument that defendant would have attempted to contest his removability had he known when his removal hearing would be held is undercut by his decision a day later, with the assistance of a federal public defender, to plead guilty to the misdemeanor of unlawful entry.

V.

For the reasons stated in open court and further developed in this Memorandum Opinion,

defendant's motion to dismiss the indictment has been denied.

Entered this 28 day of December, 2018.

Alexandria, Virginia

_____ /s/

Leonie M. Brinkema
United States District Judge